Filed 8/24/23  P. v. Stafford CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KELLY DEAN STAFFORD,<br><br>    Defendant and Appellant. | F083132<br><br>(Super. Ct. No. BF181543A)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion filed herein on August 9, 2023, be modified in the following particulars:

On page 44, the sentence appearing under "**DISPOSITION**" that reads "The prosecution shall have the opportunity to retry the gang-related charge and enhancements" is deleted and the following sentence is inserted in its place:

The prosecution shall have the opportunity to retry the gang charge in count 4 (§ 186.22, subd. (a)), the gang-murder special-circumstance allegation in count 1 (§ 190.2, subd. (a)(22)), and all gang enhancements (§ 186.22, subd. (b)(1)).

Respondent's petition for rehearing is denied.  Except for the modification set forth herein, the opinion previously filed remains unchanged.  The modification does not alter the judgment.


                                                                                    LEVY, J.

WE CONCUR:


HILL, P. J.


FRANSON, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KELLY DEAN STAFFORD,<br><br>    Defendant and Appellant. | F083132<br><br>(Super. Ct. No. BF181543A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## **INTRODUCTION**

In 2021, a jury convicted appellant Kelly Dean Stafford of first degree murder (Pen. Code, § 187, subd. (a);[1] count 1) for the 2020 shooting death of Jesse Abarca. The jury found true both a gang enhancement (§ 186.22, subd. (b)(1)) and a gang-murder special-circumstance enhancement (§ 190.2, subd. (a)(22)). The jury also found true two firearm enhancements, including that appellant had personally and intentionally discharged the firearm that caused Abarca's death (§ 12022.53, subd. (d)). Appellant received a prison sentence of life without the possibility of parole (LWOP), plus an additional 25 years to life for the personal use of the firearm.

In addition to Abarca's special-circumstance murder, the jury also convicted appellant of the following seven crimes, including a jail assault that appellant committed while in custody after he fatally shot Abarca:

1.     Possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2). The jury found true a gang enhancement allegation;

2.     Possession of ammunition by a felon (§ 30305, subd. (a); count 3). The jury found true a gang enhancement allegation;

3.     Actively participating in a criminal street gang (§ 186.22, subd. (a); count 4). The jury found true that appellant used a firearm when this crime was committed (§ 12022.5, subd. (a)), and he personally inflicted great bodily injury upon Abarca (§ 12022.7, subds. (a) & (b));

4.     Misdemeanor obstructing and/or resisting a peace officer (§ 148, subd. (a)(1); count 5);

5.     Assault on a person with force intended to cause great bodily injury (§ 245, subd. (a)(4); count 7). The jury found true a gang enhancement allegation;

6.     Misdemeanor battery on a person (§ 243, subd. (a); count 8); and

---

**1**      All future statutory references are to the Penal Code unless otherwise noted.

2.

7.      Misdemeanor obstructing and/or resisting a peace officer (§ 148, subd. (a)(1); count 9).

For the jail assault (count 7), the court sentenced appellant to prison for a consecutive aggravated term of four years, plus another consecutive four years for the gang enhancement. Appellant received a total prison sentence of LWOP, plus 25 years to life, plus eight years.[2]

Appellant raises numerous issues in the present appeal, and some of his claims have merit. In light of Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1-5), and the California Supreme Court's recent opinion in *People v. Cooper* (2023) 14 Cal.5th 735 (*Cooper*), we agree that we must reverse all of the gang enhancements and the conviction in count 4 for active gang participation. Based on changes in the law, we also agree that we must reverse the gang-murder special-circumstance enhancement. We will vacate appellant's sentence and remand this matter for further proceedings. The prosecution shall have the opportunity to retry the gang-related charge and enhancements. In all other respects, we affirm appellant's judgment, including his conviction for first degree murder.

## BACKGROUND

Appellant did not testify in this matter. We summarize the material facts supporting the judgment. We provide additional details later in this opinion when relevant to the specific issues raised.

---

[2]      Appellant also received a consecutive prison sentence of one year (one-third the midterm of three years) in a trailing companion case. In that companion matter, he pleaded guilty to possessing a knife while in jail custody in violation of section 4502, subdivision (a).

## I.     The Fatal Shooting.

On June 8, 2020, at about 7:44 a.m., Jesse Abarca was shot once in his head while he was in a public intersection in Wasco, California.  No eyewitnesses identified the shooter.  Before the shot was fired, witnesses did not hear any yelling or a confrontation.

After the shot was fired, two males were seen fleeing from the scene.  According to a witness, one suspect wore a black hoodie and the other suspect wore a white T-shirt.  A responding deputy was informed that the male wearing black was facing Abarca after the shot was fired.  The eyewitness reported to the deputy that he thought that male in black had just shot Abarca.  At trial, this same witness told the jury that a male in black was within 12 to 15 feet of Abarca right after the shooting.

Immediately after he was shot, Abarca was found lying in the road clutching a small pocketknife in his hand.  Law enforcement recovered this knife, which could fold.  The total knife was about six or seven inches long.

Abarca received medical treatment, but he never recovered from the gunshot wound.  As a result of this shooting, he died a little over one month later.

Although no surveillance cameras recorded the shooting, law enforcement was able to identify appellant as a suspect in this homicide from recordings taken from surveillance cameras in the area.  Law enforcement also identified the second suspect as a 17-year-old juvenile, B.M.

## II.     The Surveillance Recordings Showing Appellant's Actions Leading up to the Fatal Shooting.

Mere minutes before Abarca was fatally shot, recordings from surveillance cameras show him encountering appellant and B.M. at a convenience store about two blocks from the site of the fatal encounter.  Inside the store, appellant and Abarca had eye contact and they nodded at each other.  No words were apparently exchanged, and nothing violent occurred at that time.  Appellant and B.M. went outside and waited near the store's entrance.  Less than a minute later, Abarca left the store and he walked alone

4.

in the direction where the fatal shooting was about to occur mere minutes later. Appellant and B.M. lingered in front of the store for about 15 seconds. B.M. started to walk after Abarca but he turned back apparently at appellant's direction, who is seen speaking to him. Appellant and B.M. looped around the back of the convenience store before walking after Abarca. While behind the convenience store, appellant pulled up a hoodie to cover his face, and he is seen directing B.M. to do the same. B.M. also covers his face with his hoodie. The fatal shooting occurred about four minutes later and about two blocks away.

After Abarca was shot, a surveillance camera captured appellant and B.M. fleeing nearby through an alley. It appears that appellant is holding something in his right hand as he runs.[3] It does not appear that B.M. has anything in his hands as he flees the scene. B.M.'s deoxyribonucleic acid was matched to a freshly smoked cigarette found in the area where appellant and B.M. were recorded fleeing from the scene of the shooting.

## III. Appellant Commits a Jail Assault.

About 15 days after Abarca was shot, appellant was arrested in Wasco, California. Despite being told to stop by a uniformed deputy, appellant briefly fled on foot before he was taken into custody.

While in jail custody on July 12, 2020, appellant attacked another inmate, Ryan Thatcher. Appellant punched the back of Thatcher's head and they fought. Appellant did not comply with commands to stop fighting, and a deputy sprayed him with pepper spray. After this fight, Thatcher had a small amount of blood on his upper lip.

---

[3] Law enforcement did not locate any shell casings at the shooting scene. At least part of a bullet was removed from Abarca's head. It was in the .38-caliber "family" and consistent with being fired from a .38- or .357-caliber revolver. Law enforcement never recovered the firearm used to shoot Abarca.

**IV.** **The Prosecution Established that both Appellant and B.M. were Active Gang Members.**

At trial, the prosecution's gang expert opined that both appellant and B.M. were active gang members when Abarca was fatally shot. They belonged to the Varrio Wasco Rifas (VWR), a Sureño gang in Wasco.[4] Appellant had numerous gang-related tattoos on his body, including some on his face. He had numerous prior contacts with law enforcement while in the presence of other gang members. He had a prior felony conviction in 2018 for illegal possession of a firearm and that jury had convicted him of actively participating in a criminal street gang (§ 186.22, subd. (a)).

**V.** **The Gang-Related Motive for Appellant's Crimes.**

The prosecution established a gang-related motive for why appellant attacked both Abarca and Thatcher. Appellant had previously directed a VWR associate, Israel Esquivel, to attack other jail inmates who were on protected custody (PC) status. Esquivel and appellant were housed in the same jail facility when appellant directed Esquivel to attack inmates on PC status. This directive was discovered in a recorded jail call Esquivel made to his father in which he complained that appellant had wanted him to assault PC inmates.

The prosecution's gang expert explained that appellant's gang looks down on those in PC status. This term originated in a custodial setting and it referred to sex offenders, gang dropouts and homosexuals. The expert told the jury that PCs who are not in jail but still living in Wasco are a target within the city by active VWR gang members. According to the expert, "VWR gang members will look for [PCs], try to locate them, and when they do, they assault them or could kill them, and if they come across them, they are expected to do something about it."

---

**4** The gang expert also opined that appellant was an active VWR member when his jail assault occurred on July 12, 2020.

When he was fatally shot, Abarca was a registered sex offender. The jury learned that Abarca had been previously booked in jail about 14 times. When he was in custody, Abarca had been placed on PC status because of his prior sex offense with a minor. Likewise, Thatcher was on PC status when appellant subsequently assaulted him in jail following Abarca's fatal shooting. The jury learned that, after appellant assaulted Thatcher in jail, he indicated to officials that he knew Thatcher was on PC status, and appellant was concerned that Thatcher could have been a child molester.

During trial cross-examination, the gang expert confirmed that gang members will look for PCs and try to kill them if they can. The expert, however, did not know if that was an order coming from someone within the Mexican Mafia.[5] The expert explained that, if a VWR gang member is seen within close proximity of a PC and the gang member does not act upon it, the gang member could face retaliation from other members of his gang.

Based on hypotheticals that mirrored the facts of this fatal shooting, the gang expert opined that appellant and B.M. committed this homicide to further the interests of their gang. Likewise, based on a hypothetical that mirrored appellant's jail assault, the expert opined that appellant had assaulted Thatcher to benefit and further the VWR gang. The expert explained that active gang members inside custodial settings—"just like outside on the streets"—are expected to assault PC inmates whenever the opportunity arises.

---

[5] The jury learned that, in general, Sureños take orders from the Mexican Mafia, which is a prison gang.

**DISCUSSION**

**I.** **Appellant's Constitutional Rights were not Violated from the Prosecution's Gang Expert's Testimony; This Claim is Forfeited; It also Fails on its Merits and any Presumed Error is Harmless.**

Prior to trial the parties alerted the court that B.M. had been arrested for his alleged role in this matter and, while in police custody, B.M. had allegedly informed authorities that appellant had shot Abarca.[6] B.M. had allegedly stated during his custodial interrogation that, as they watched Abarca exit the convenience store, appellant had asked B.M. if Abarca was "good" and whether Abarca was "PC." Appellant then directed B.M. to accompany him to follow and attack Abarca. B.M. allegedly told authorities that appellant was "an evil person."

The trial court precluded all witnesses from discussing or alluding to B.M.'s alleged custodial statements.[7] The court also precluded the prosecution's gang expert from relying on testimonial hearsay to establish appellant's status as a gang member in violation of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

In general, *Crawford* holds that admission of testimonial hearsay[8] against a criminal defendant violates the confrontation clause of the Sixth Amendment of the United States Constitution unless (1) the declarant is unavailable to testify and (2) the

---

[6] B.M. was arrested about eight days after Abarca was shot.

[7] B.M. did not testify in this matter.

[8] Testimonial statements under *Crawford* "are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Sanchez*, *supra*, 63 Cal.4th at p. 689.) The California Supreme Court has clarified a testimonial statement has two requirements. First, the hearsay statement must have been made with some degree of solemnity or formality. Second, the primary purpose of the statement must pertain in some fashion to a criminal prosecution. (*People v. Gomez* (2018) 6 Cal.5th 243, 297.)

defendant had a previous opportunity to cross-examine the witness. (*Crawford*, *supra*, 541 U.S. at p. 68.) In *Sanchez*, the California Supreme Court held that "case-specific" statements related by a gang expert concerning a defendant's gang membership are inadmissible under California law if those statements are based on hearsay. (*Sanchez*, *supra*, 63 Cal.4th at p. 684.) Such evidence must be independently established in court. (*Ibid.*)

At trial in this matter, the prosecution's gang expert opined that members of appellant's gang actively look to assault or attempt to kill people who have a PC status. The gang expert told the jury that VWR gang members look to attack persons classified as PC both in and out of jail custody. In the present claim, appellant contends that this portion of the gang expert's testimony violated his constitutional rights under *Crawford*. Specifically, appellant questions the evidentiary support for the gang expert's opinion that VWR members are expected to assault or kill persons labeled PC while they are *out in public* (versus while in custody). According to appellant, the gang expert must have relied on B.M.'s alleged custodial statements to render this opinion. As such, appellant argues that the gang expert relied on testimonial hearsay in violation of *Crawford*. Appellant asserts he was deprived of his rights to due process and a fair trial. He seeks reversal of his murder conviction.

This claim lacks merit. We agree with respondent that appellant has failed to preserve this issue for appellate review. In any event, we reject this claim on its merits and any presumed error is harmless.

### A. Appellant has forfeited this claim.

The parties agree that appellant did not object at trial when the prosecution's gang expert opined that VWR gang members are expected to attack persons of PC status even outside a custodial setting. Respondent argues that this claim is forfeited. In contrast,

appellant asserts that, following his successful motion in limine regarding *Crawford*, he was not required to do anything further to preserve this issue for appeal.

We agree with respondent that this claim is forfeited, and we reject appellant's arguments. In certain circumstances, a motion in limine can preserve an issue for appeal "so long as the party objected to the specific evidence on the specific ground urged on appeal at a time when the court could determine the evidentiary question in the proper context." (*People v. Solomon* (2010) 49 Cal.4th 792, 821.) When properly directed, a motion in limine may satisfy the requirements of Evidence Code section 353[9] and preserve objections for appeal, but "the proponent must secure an express ruling from the court. [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171.)

Here, the trial court granted various defense motions in limine before the jury heard testimony in this matter. Contrary to appellant's assertion, however, those motions did not preserve the present issue for appeal.

From defense motion in limine No. 11, the court precluded all trial witnesses from discussing or alluding to B.M.'s alleged custodial statements. From defense motion in limine No. 15, the court precluded the prosecution's gang expert from relying on testimonial hearsay to establish appellant's status as a gang member in violation of *Crawford* and *Sanchez*. Lastly, from defense motion in limine No. 18, the court impliedly agreed that, as to any motion in limine, the defense was not required to lodge any further objection to preserve the issue for appeal.

These general motions in limine did not address the specific issue that appellant now raises. As such, appellant's cited authority—*People v. Scott* (1978) 21 Cal.3d 284—

---

[9] Evidence Code section 353 states, in relevant part, that a judgment shall not be reversed due to the erroneous admission of evidence unless (a) an objection or motion to exclude was timely made with clear specific grounds and (b) the error in failing to exclude the evidence resulted in a miscarriage of justice. (Evid. Code, § 353, subds. (a) & (b).)

10.

does not assist him, and we reject appellant's position that he was not required to make a specific objection at trial regarding the gang expert's disputed testimony. Unlike what occurred in *People v. Scott*, the record here does not demonstrate or even reasonably suggest that the trial court would have "fully understood and considered the nature of the constitutional challenges" which appellant now raises. (*Id.* at p. 290.) Thus, we reject appellant's position that there was "nothing to gain" from raising an objection at trial when the disputed expert opinion was given.

Based on this record, appellant has forfeited his claim that his constitutional rights were violated when the prosecution's gang expert testified that VWR gang members are expected to attack persons of PC status even outside a custodial setting. At no time, either before or during trial, did the defense ask the court to resolve a specific dispute regarding that testimony. Thus, appellant cannot argue that the court erred in failing to conduct an analysis it was not asked to conduct. (See *People v. Tully* (2012) 54 Cal.4th 952, 980.) Consequently, appellant has not preserved this issue for appeal, and it is deemed forfeited. In any event, we also reject this claim on its merits.

## B. This claim fails on its merits.

Appellant argues that no evidence was introduced at trial establishing that a "gang-wide directive" existed for members of his gang to attack people classified as PC.[10] Appellant maintains that the prosecution's gang expert must have derived his disputed opinion from B.M.'s custodial statements, and appellant notes he was unable to cross-examine B.M. at trial. As such, appellant contends that the gang expert's opinion was provided in violation of *Crawford* and *Sanchez*. He takes the position that the gang

---

[10] The prosecution's gang expert opined that the primary activities of VWR gang members are burglary, robbery, carjacking, weapon and firearm possession, sales of narcotics, attempted murder and murder. Appellant notes that the gang expert never stated that assaults on people classified as PC, either in or out of custody, was a primary offense. Appellant also notes that none of the predicate offenses discussed at trial involved murder or attempted murder of PC victims.

11.

expert's disputed testimony did not involve background facts regarding the VWR gang but, instead, was offered to show appellant's motive and intent to prove he acted with premeditation. Appellant maintains that his murder conviction must be reversed.

Appellant's various assertions are unpersuasive. This record does not establish or even reasonably suggest that the prosecution's gang expert relied on testimonial hearsay to render his disputed opinion. Moreover, the expert's opinion was not a case-specific fact. As such, neither *Crawford* nor *Sanchez* were violated.

At trial, the gang expert never suggested he derived his disputed opinion from B.M.'s custodial statements. To the contrary, trial evidence showed how appellant reacted to persons on PC status. After appellant assaulted Thatcher in jail, he indicated to officials that he knew Thatcher was on PC status, and appellant was concerned that Thatcher could have been a child molester. The expert confirmed at trial that he had been present in court when testimony had been received about people in PC status. The gang expert confirmed that he had heard the jail call from Esquivel, which had been played in court. The expert found it significant that appellant had pressured Esquivel to "take off on PCs." The expert had prior contact with Esquivel, and the expert opined that Esquivel was an associate of the VWR gang. According to the expert, Esquivel's recorded phone call showed an active gang member (appellant) telling Esquivel to assault a person on PC status, "which is something that they are expected to do whenever they are confronted." Still later when responding to a hypothetical mirroring appellant's jail assault, the gang expert opined that the assault was committed to benefit and further the VWR gang. The expert explained that active gang members inside custodial settings—"just like outside on the streets"—are expected to assault PC inmates whenever the opportunity arises.

The gang expert was permitted to use his special knowledge and experience to explain to the jury the significance of the trial evidence. (Evid. Code, § 801, subd. (b).) The expert's opinion did not involve testimonial hearsay and no *Crawford* violation is present. Likewise, we reject appellant's assertion that no evidence supported the gang

expert's opinion, or that the expert's testimony was derived from an unsubstantiated "rumor." It was the jury's exclusive role to determine what weight, if any, to give this testimony. (*People v. Veamatahau* (2020) 9 Cal.5th 16, 34–35, fn. 6.)

Moreover, we agree with respondent that the gang expert's disputed testimony involved permissible background facts. Our high court in *Sanchez* recognized the distinction between lay opinions and those given by an expert. Unlike lay witnesses, an expert has greater latitude and may express an opinion on a subject that is sufficiently beyond common experience so that it may assist the jury. (*Sanchez*, *supra*, 63 Cal.4th at p. 675; see also Evid. Code, § 801, subd. (a).) In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from other sources. (*Sanchez*, *supra*, at p. 675.) "An expert's testimony as to information generally accepted in the expert's area, or supported by his own experience, may usually be admitted to provide specialized context the jury will need to resolve an issue. When giving such testimony, the expert often relates relevant principles or generalized information rather than reciting specific statements made by others." (*Ibid.*)

The *Sanchez* court recognized a distinction between general background information in an expert's field of expertise versus case-specific facts about which the expert has no independent knowledge. (*Sanchez*, *supra*, 63 Cal.4th at p. 676.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid*.) Case-specific facts should be introduced into evidence through a witness who has personal knowledge about them. (*Ibid*.) An expert may then testify about more generalized information to help jurors understand the significance of case-specific facts, and an expert is permitted to give an opinion about what those facts might mean. (*Ibid*.)

Through Esquivel's jail recording, the jury learned that appellant wanted Esquivel to attack inmates classified as PC. The jury also learned that appellant had assaulted

Thatcher in jail because appellant knew Thatcher was on PC status. The prosecution's gang expert was permitted to explain the significance of those case-specific facts. The gang expert's disputed testimony provided background information about how VWR members conduct themselves in general and how they are expected to act in certain situations. The prosecution's gang expert was permitted to provide his general knowledge and expertise about this gang. (See *Sanchez*, *supra*, 63 Cal.4th at p. 685.) As such, the gang expert's disputed opinion testimony did not violate *Sanchez*.

Finally, appellant's cited authority—*People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), disapproved on another ground in *People v. Vang* (2011) 52 Cal.4th 1038, 1047–1048, fn. 3—does not assist him. Unlike what occurred in *Killebrew*, the prosecution's gang expert in this matter did not testify about appellant's specific knowledge and subjective intent. (See *Killebrew*, *supra*, at p. 658.) Instead, the gang expert here explained how a member of appellant's gang would be expected to act when encountering a person classified as PC. *Killebrew* is distinguishable.

Based on this record, neither a *Crawford* nor a *Sanchez* error is present. Consequently, appellant's constitutional rights were not violated and this claim is without merit. In any event, we also conclude that any presumed error is harmless.

### C. Any presumed error is harmless.

Appellant contends that the prosecutor's closing argument effectively urged the jury to use the gang expert's disputed opinion as evidence of an intent to kill. According to appellant, this disputed opinion testimony was "critical" to the prosecution's case to show that appellant was guilty of premeditated murder. Appellant asserts that this alleged constitutional error reduced the prosecution's burden of proof, and his murder conviction must be reversed. We disagree.

The parties dispute the appropriate standard of review. According to appellant, his federal constitutional rights were violated so we must analyze prejudice under *Chapman*

*v. California* (1967) 386 U.S. 18 (*Chapman*). Under *Chapman*, the party who benefitted from the error must establish beyond a reasonable doubt that the constitutional error did not contribute to the verdict. (*Id.* at p. 24.) In contrast, respondent asserts that no federal constitutional error occurred, so we must analyze prejudice under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). Under *Watson*, the question is whether it is reasonably probable the verdict would have been more favorable to appellant absent the error. (*Id.* at p. 836.)

We need not resolve the appropriate standard of review. Instead, we can declare under either standard that any presumed error was harmless. The surveillance recordings overwhelmingly establish that appellant held an intent to kill, and that this murder was premeditated and deliberate. Appellant directed B.M. throughout the moments leading up to the shooting, and it was appellant who initiated the fatal attack. Appellant and B.M. followed Abarca, and appellant tried to hide his actions by taking B.M. in a circuitous route behind the convenience store before setting out. Appellant covered his head with his hoodie, and he directed B.M. to do the same. Abarca was shot in his head, and appellant fled while positioning his right hand in a way that reasonably suggests he was holding the handgun that fatally wounded Abarca. In contrast, B.M. ran away with both hands free.

Just after this shooting, an eyewitness reported to a responding deputy that a male was facing Abarca after the witness heard the shot fired. This male had worn all black and the eyewitness reported to the deputy that he thought that male had just shot Abarca. At trial, this same witness told the jury that a male in black was within 12 to 15 feet of Abarca right after the shooting. Based on the surveillance video, it is abundantly apparent that appellant was the male wearing all black clothing who was spotted closer to Abarca after the fatal shot was heard. On the day in question, appellant was wearing all black, with black pants, a black hat, and a black hooded sweatshirt. In contrast, B.M. was wearing tan khaki shorts, and a dark blue sweatshirt and hat.

15.

During closing argument, the prosecutor did not rely on the gang expert's disputed testimony to establish appellant's intent to kill. Instead, the prosecutor focused on the video surveillance footage, asserting that appellant was the shooter, and he had intentionally killed Abarca. The prosecutor asserted that the facts established first degree murder.

Although the prosecutor discussed appellant's possible motive for these crimes, those arguments were relatively brief and limited in scope. The prosecutor asserted that appellant's jail assault involved the same motive as the murder of Abarca. The prosecutor argued that appellant was "required and expected" to assault people classified as PC. The prosecutor stated that appellant recognized Abarca in the market, and Abarca was a sex offender who had been previously booked as a PC.

The prosecutor informed the jury that the People were not required to prove a motive. However, a motive could be a factor in showing appellant's guilt. According to the prosecutor, appellant had a motive to assault a person like Abarca because appellant was a member of VWR. The prosecutor referenced the gang expert's testimony to emphasize that VWR gang members are known to assault persons labeled as PC. The prosecutor reminded the jury that they could listen to the recording of Esquivel's jail call on that issue.

During rebuttal, the prosecutor again emphasized that all of the evidence showed that appellant had been the actual shooter, and he had intended to kill. Although it was undisputed that Abarca had been shot while holding a knife, the prosecutor argued that Abarca had done so for his own reasonable protection. No injuries were seen on appellant when he had been arrested, and there was no indication of a fight. According to the prosecutor, nothing reasonably showed that appellant had acted in his own lawful self-defense. The prosecutor concluded his remarks by again emphasizing that appellant was the shooter, and this was first degree murder.

16.

While the prosecutor discussed how and why appellant might be motivated to attack Abarca, we reject appellant's position that the prosecutor used the expert's disputed testimony to establish an intent to kill. Based on this record, we can declare beyond a reasonable doubt that any presumed constitutional error was harmless. The gang expert's opinion testimony regarding how VWR gang members react to persons labeled PC was unimportant in relation to everything else the jury considered regarding appellant's liability for first degree murder. (See *Yates v. Evatt* (1991) 500 U.S. 391, 403, disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72–73, fn. 4.) Appellant's own recorded conduct on the fatal day clearly and unmistakably demonstrated his premeditated intent to kill. Thus, we can declare that the guilty verdict actually rendered in this trial was surely unattributable to this assumed error. (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) Consequently, prejudice is not present under the federal standard. (See *Chapman*, *supra*, 386 U.S. at p. 24.) Likewise, it is not reasonably probable the verdict would have been more favorable to appellant absent this presumed error. Accordingly, prejudice is also not present under the state standard. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Therefore, this claim is without merit, and the murder conviction will not be reversed.

## II.     The Admission of Appellant's Recorded Rap Lyrics was Harmless.

On or about June 23, 2020, appellant was taken into custody for his involvement in Abarca's shooting. On November 7, 2020, appellant was in jail custody when he participated in a telephone call, which was recorded. Appellant performed the following rap over the telephone:

> ". . . I'm the beast in the streets, man. I leave 'em deceased. Yeah, my boy the Grim Reaper. Yeah, he playin' for keeps. Talkin' shit through the heat; wants the bullets released. Now, I'm all up in the news and all the TV screens from the Golden State with the murderer rate just watch it escalate 'cause Kelly highly active and you know we don't play. You should get two hundred once they crack the gate but now, I'm here to stay strapped up (inaudible words). We thuggin' in the summer (inaudible

17.

words) because if you ain't active, boy, you ain't gettin' no love. (Inaudible words) bitches (inaudible words) unless they givin' up the pussy (inaudible words) real love so fuck all that fake shit. The heart breaks. (Inaudible words) The City of Roses where everyone knows this but mind your fuckin' business because we ditching the witness. The sickest of the sick, boy (inaudible word) and I ain't gotta lie, boy. You know that I live this."

Prior to trial, the prosecution filed a motion in limine seeking permission to introduce this recording into evidence. The written motion asserted that the rap showed appellant's motive for Abarca's murder, and it demonstrated his continued active participation in his gang.

At oral argument, the defense opposed admission of this evidence under Evidence Code section 352, arguing the rap lyrics were highly prejudicial. The court stated that it appreciated the defense's position that the rap could be deemed a form of art, but the court also believed the rap showed appellant's knowledge of the gang's lifestyle and motives. According to the court, the rap alluded to specific acts which could be connected to Abarca's murder. The lyrics said "strapped," which meant carrying a firearm. Abarca's fatal shooting occurred in June and the lyrics said they were "thuggin' in the summer." Finally, the rap referenced the "City of Roses," which referred to the City of Wasco.[11] The court granted the prosecution permission to introduce the recorded rap into evidence, and it was eventually played for the jury.

In the present claim, appellant asserts that the trial court abused its discretion in permitting introduction of the recorded rap lyrics. According to appellant, this evidence was more prejudicial than probative and it should have been excluded under Evidence Code section 352. He contends his conviction for first degree murder must be reversed.

---

[11] At trial, the prosecution's gang expert explained that the City of Wasco is known as the "City of Roses" because roses are cultivated there.

18.

After appellant filed his opening brief in this matter, the Governor approved Assembly Bill No. 2799 (2021-2022 Reg. Sess.). Effective January 1, 2023, this bill added Evidence Code section 352.2, which states:

> "(a) In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings."

Evidence Code section 352.2, subdivision (d), provides that the admissibility of a form of creative expression shall be heard in limine and determined by the court outside the jury's presence, and the court "shall state on the record its ruling and its reasons therefor." (Evid. Code, § 352.2, subd. (d).) There is currently a split of authority regarding whether Assembly Bill No. 2799 should be deemed retroactive to criminal matters not yet final on appeal. (See *People v. Venable* (2023) 88 Cal.App.5th 445, 456–457 [Evidence Code section 352.2 should be deemed retroactive], review granted May 17, 2023, S279081; cf. *People v. Ramos* (2023) 90 Cal.App.5th 578, 596 [Evidence Code section 352.2 does not apply retroactively].) Our high court is currently deciding how to resolve this issue.

The parties filed supplemental briefing regarding Assembly Bill No. 2799. According to appellant, this bill should be deemed retroactive, and his judgment must be reversed. He argues that we should remand this matter for a new trial with directions for the trial court to exclude the rap lyrics if the prosecution elects to retry him. In contrast,

19.

respondent contends that Assembly Bill No. 2799 should not apply retroactively. In any event, respondent asserts that appellant did not suffer prejudice.

We agree with respondent that, even if Evidence Code section 352.2 retroactively applies to appellant, remand is not appropriate because appellant did not suffer prejudice. Consequently, we need not resolve whether Assembly Bill No. 2799 is retroactive. Likewise, we need not address whether the court abused its evidentiary discretion or whether it would have admitted this evidence under the heightened standards required in Evidence Code section 352.2. Any presumed evidentiary error is harmless.

Appellant claims that the evidence was not overwhelming regarding his premeditated intent to kill Abarca. He notes that Abarca drew out a knife and, as such, appellant contends that the evidence shows, at most, only his implied malice[12] to kill. Appellant argues that his rap was "vital" to the prosecution's theory that he premeditated this fatal shooting. Appellant contends that the amount of gang evidence introduced against him at trial was "overkill." He asserts that his rap lyrics were cumulative to the other gang evidence and this evidence was so prejudicial—and had such little relevance—that it raised a potential the jury would convict him regardless of his actual guilt. He maintains that introduction of his rap lyrics violated his federal constitutional rights to due process and a fair trial.

We reject appellant's various contentions. The rap evidence was not crucial in demonstrating that this was a gang-related murder. The trial evidence overwhelmingly established that appellant was an active gang member when he shot Abarca. Appellant

---

[12] In contrast to express malice, implied malice requires an intent to do some act, and the natural consequences of that act are dangerous to human life. (*People v. Swain* (1996) 12 Cal.4th 593, 602.) Under CALCRIM No. 520, implied malice exists if a defendant (1) intentionally commits an act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time the defendant acted, he knew his act was dangerous to human life; and (4) the defendant deliberately acted with a conscious disregard for human life.

20.

previously admitted his active gang membership to different law enforcement personnel, and he had numerous gang tattoos on his body—including two on his face. Appellant fatally wounded Abarca while another active gang member, B.M., was with him. It is abundantly apparent that the rap lyrics had no bearing on establishing either appellant's gang membership or that this was a gang-related shooting. Indeed, before the prosecution's gang expert explained the significance of appellant's recorded rap, the expert had already opined that appellant was an active member of VWR when he shot Abarca. Although the expert stated that the rap contributed to his opinion that appellant was an active member of VWR, it is clear that, even without the admission of appellant's rap, the prosecution's gang expert would have nevertheless reached the same conclusion.

The surveillance videos overwhelmingly demonstrate appellant's intent to kill and that this murder was premeditated and deliberate. Appellant followed Abarca before shooting him. Appellant used a circuitous route and he attempted to hide his face. Appellant directed B.M., a fellow VWR gang member, to accompany him. After shooting Abarca, appellant and B.M. fled. Appellant ran away holding an object in his right hand. A reasonable inference may be drawn that appellant is holding the handgun used to fatally wound Abarca. Excluding the rap lyrics, the record conclusively establishes that appellant held a premeditated intent to kill.

During opening statements, the prosecutor informed the jury that they would hear about a jail call that appellant made in November 2020 "where he raps about gang membership and talks about killing people and [makes a] reference to the summer." Later during opening statements, the prosecutor again stated that the jury would hear about appellant rapping in jail about being an active gang member, leaving someone deceased, and talking about the City of Roses.

At the conclusion of trial and during closing argument, the prosecutor only mentioned the rap lyrics once. The prosecutor invited the jury to evaluate the lyrics. The prosecutor stated that he was "not going to suggest to you that every single thing that

21.

[appellant] said is true, but I want to point out a few things." The prosecutor noted that appellant was not trying to sell this song commercially but, instead, this was done during a jail call. According to the prosecutor, the rap demonstrated appellant's continued participation in his gang, and it incorporated some of the things that had happened during Abarca's shooting. During rebuttal argument, the prosecutor did not once mention the rap evidence.

Contrary to appellant's assertions, his recorded rap lyrics were neither crucial to establish his premeditated intent to kill nor his active gang participation. Instead, it is overwhelmingly apparent that appellant was an active gang member when these crimes occurred, and the surveillance footage conclusively and overwhelmingly demonstrated that he committed first degree murder. Thus, we can declare that the guilty verdicts actually rendered in this trial were surely unattributable to this error. (See *Sullivan v. Louisiana*, *supra*, 508 U.S. at p. 279.) Consequently, prejudice is not present under the federal standard. (See *Chapman*, *supra*, 386 U.S. at p. 24.) Likewise, it is not reasonably probable the verdicts would have been more favorable to appellant absent this error. Accordingly, prejudice is also not present under the state standard. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) We reject appellant's assertion that his judgment must be reversed.

## III. Appellant has Forfeited his Claim of Instructional Error with CALCRIM No. 1403 and this Claim Fails on its Merits.

With CALCRIM No. 1403, the trial court instructed the jurors to only consider the gang evidence for limited purposes, including appellant's intent and motive regarding the charged crimes and enhancements. The jurors were also told that they could consider the gang evidence to decide whether appellant "actually believed in the need to defend himself." The jurors were instructed that they could not consider the gang evidence for any other purpose, and they could not conclude from this evidence that appellant was a person of bad character or that he had a disposition to commit crimes.

22.

Appellant asserts that a portion of CALCRIM No. 1403 is legally erroneous. He argues it was improper to instruct the jurors that they could consider the gang evidence to decide if he *actually believed in the need to defend himself.* According to appellant, this disputed language suggested that jurors could reject a claim of self-defense or imperfect self-defense[13] simply because gang members are prone to violence. He also contends that this language is ambiguous because it does not explain how the jury should consider the gang evidence in relationship to self-defense or imperfect self-defense. Appellant contends that his murder conviction should be reversed.

Appellant's arguments are unpersuasive. We agree with respondent that this claim is forfeited. In any event, we also reject it on the merits.

## A. This claim is forfeited.

Prior to trial, the defense requested a limiting instruction regarding the gang evidence. At no time, did the defense request any modification of CALCRIM No. 1403. Because the defense did not seek any clarifying language, respondent asserts that this claim is forfeited. In contrast, appellant contends that—even though his trial counsel requested this instruction—this claim cannot be deemed forfeited because his substantial rights are impacted.

Under section 1259, an appellate court may review any jury instruction given—even though no objection was made below—"if the substantial rights of the defendant were affected thereby." (§ 1259.) We agree with respondent that this claim is forfeited.

Because CALCRIM No. 1403 is a limiting instruction, the trial court had no sua sponte duty to give it. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1051–1052.) A defendant may raise for the first time on appeal a claim of instructional error that impacts his substantial rights. However, the defendant may not argue on appeal that a correct

---

[13] Associated with Abarca's murder charged in count 1, the trial court instructed the jury with CALCRIM Nos. 505 and 571 regarding the doctrines of self-defense and imperfect self-defense (including the right to defend another).

instruction was too general or incomplete, and thus needed clarification, without first requesting the clarification at trial. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428; *People v. Hardy* (2018) 5 Cal.5th 56, 91; see also *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 [aiding and abetting instruction].) When an instruction as given is legally correct, the defendant must request clarifying language, and his failure to do so forfeits that issue. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877; *People v. Kaihea* (2021) 70 Cal.App.5th 257, 265 (*Kaihea*); *Samaniego*, at p. 1163.)

As we explain below, CALCRIM No. 1403 correctly states the law. Accordingly, appellant's failure to raise these issues below results in the forfeiture of this claim. We also conclude that this claim fails on its merits.

## B. Instructional error did not occur.

The language from CALCRIM No. 1403 which appellant now disputes appears in an optional bracket for a trial court to use. At least one published opinion has already held that this bracketed language correctly states the law.

In *Kaihea*, the appellate court rejected a similar claim to the one advanced here. The *Kaihea* court held that the optional language in CALCRIM No. 1403—that a jury could consider gang evidence to decide if the defendant *actually believed in the need to defend himself*—correctly stated the law. (*Kaihea*, *supra*, 70 Cal.App.5th at p. 265.) *Kaihea* noted that "motive, self-defense, and heat of passion are similar in that they all relate to the reason why a defendant engaged in the alleged conduct." (*Ibid.*) Gang evidence can demonstrate that a defendant killed because of a gang-related motive and not from self-defense or the defense of another. (*Id.* at pp. 265–266.) A defendant who desires to kill a gang rival is not entitled to claim self-defense even if he also acts on the basis of fear. (*Kaihea*, *supra*, at p. 266, citing *People v. Nguyen* (2015) 61 Cal.4th 1015, 1044.)

During closing argument in this matter, appellant did not assert that he had acted in self-defense or in the defense of another. Instead, he argued it was B.M. who had shot Abarca. According to the defense, B.M. had fired at Abarca in an effort to defend appellant because Abarca had pulled out his knife. Appellant's trial counsel asked the jurors to find appellant not guilty of murder.

We agree with *Kaihea*'s reasoning, and we reject appellant's assertion that *Kaihea* was wrongly decided. The disputed language from CALCRIM No. 1403 is legally correct. The jury was entitled to consider appellant's and B.M.'s gang membership when determining whether self-defense or defense of another applied. (See *Kaihea*, *supra*, 70 Cal.App.5th at p. 265.) Instructional error did not occur and this claim fails.[14]

## IV. Appellant has Forfeited his Claim of Instructional Errors Regarding Premeditated Murder; this Claim also fails on its Merits.

Appellant contends that instructional errors occurred regarding premeditated murder. He raises two separate but overlapping issues.

First, appellant concedes that, based on the verdicts rendered in count 1, the jury necessarily found that he was the actual and direct perpetrator of Abarca's death, and the jury rejected the prosecutor's alternative theory that appellant was guilty of murder as an aider and abettor. However, appellant argues that the jurors could have impermissibly believed they could find him guilty of premediated murder even if he did not have a premeditated intent to kill. According to appellant, the jury could have believed that B.M. had held a premeditated intent to kill and appellant had only exhibited implied malice, i.e., he assaulted Abarca with a firearm but without expressly intending Abarca's death. Appellant asserts that it is reasonably probable the jury found him guilty of first degree murder by imputing the premeditation from B.M. Appellant maintains that

---

[14] Because instructional error did not occur, we do not address appellant's arguments regarding alleged prejudice.

reversal is required unless his first degree murder conviction is based on a valid legal theory.

Second, appellant contends that the trial court erroneously told the jurors that both perpetrators and those who aid and abet are "equally guilty" of any crime.[15] According to appellant, the court failed to inform the jurors that a direct perpetrator may be guilty of a less serious offense. According to appellant, the jury could have found him guilty of first degree murder because he acted with implied malice as the perpetrator while B.M. harbored a premeditated intent to kill as an aider and abettor, but the jurors were told that they were both "equally guilty." Appellant claims that his conviction for first degree murder must be reversed.

We reject appellant's arguments. This claim is forfeited. In any event, it is not reasonably likely the jury misunderstood the law. Instructional error did not occur.

## A.     Appellant has forfeited this claim.

Appellant concedes that he failed to object when the trial court gave the instructions that he now contends were erroneous. To overcome forfeiture, appellant argues that this claim impacts his substantial rights and should be reviewed under section 1259. We disagree.

Our Supreme Court makes it clear that the forfeiture doctrine applies to a defendant who fails to object to a jury instruction. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) As we explain below, it is not reasonably likely the jury was confused in the manner appellant now claims. As such, we reject appellant's assertion that the alleged instructional errors impacted his substantial rights. This claim is forfeited based on appellant's failure to object. In any event, we also reject this claim on its merits.

---

[15]     This was given as "Special" instruction number 1.

26.

**B.     This claim fails on its merits.**

Appellant must demonstrate a reasonable likelihood the jury applied the instructions in an impermissible manner.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229; *People v. Cross* (2008) 45 Cal.4th 58, 67–68.)  We take into account the trial record and the arguments from counsel.  (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.)

This record amply demonstrates that it is not reasonably likely the jury would have believed it could impute premeditation from B.M. to appellant.  The jury was told that, to be guilty of murder, the prosecution had to prove that appellant acted with malice aforethought.  The jury was informed that malice could be either express or implied, and those concepts were explained.  The jurors were instructed that, if appellant committed murder, it was murder in the second degree unless the People had proven beyond a reasonable doubt that it was murder in the first degree.

With CALCRIM No. 521, the jury was told that appellant was being prosecuted under a theory that the murder was willful, deliberate, and premeditated.  According to the trial court, appellant was guilty of first degree murder if the People had proven that he acted willfully, deliberately and with premeditation.  He acted willfully if he intended to kill.  He acted deliberately if he carefully weighed the considerations for and against his choice and decided to kill knowing the consequences.  He acted with premeditation if he decided to kill before completing the act that caused death.

The court stated that the length of time "the person" spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated.  Instead, the amount of time required for deliberation and premeditation may vary "from person to person" and according to the circumstances.

Appellant focuses on the court's use of the word "person" in attempting to demonstrate instructional error.  According to appellant, the jury could have understood that if B.M. (another "person" involved in this shooting) aided and abetted while holding

27.

a premeditated intent for Abarca to die, then appellant could be guilty of first degree murder even if he had only intended to assault Abarca with a firearm. Appellant's position lacks merit.

During closing argument, the prosecutor never argued or suggested that the jurors could find appellant guilty of first degree murder based on a theory that appellant had only exhibited implied malice and premeditation could be imputed to appellant through B.M. Instead, the prosecutor repeatedly asserted that appellant was the person who had shot Abarca, and appellant had held an intent to kill. The prosecutor argued that this killing was premeditated because appellant had directed B.M., and appellant took a circuitous route to follow Abarca. Appellant and B.M. traveled "a great distance" on foot before shooting Abarca in the head and fleeing.

Although the prosecutor raised an alternative theory that appellant was guilty as an aider and abettor, it is not reasonably likely the jurors would have understood the legal instructions in the manner appellant now advances in this claim. In fact, the prosecutor argued that, if the jurors decided appellant was guilty of first degree murder as an aider and abettor, they were required to find that appellant had intended to kill in order to find true the gang-murder special-circumstance allegation.

The jury found appellant guilty of first degree murder. The jury found true that appellant had personally shot Abarca. The jury also found true the gang-murder special-circumstance allegation. The surveillance footage before and after this fatal shooting overwhelmingly demonstrates that appellant was not an aider and abettor but, rather, he was the direct perpetrator of Abarca's death. The totality of this record does not support appellant's claim of instructional error. We reject appellant's assertion it is reasonably likely the jurors would have believed it was appropriate to impute B.M.'s premeditation (if any) to find appellant guilty of first degree murder. It is abundantly clear that appellant was convicted on a legally valid theory.

Finally, we reject appellant's assertion that instructional error occurred when the trial court told the jury that an aider and abettor is "equally guilty" as a perpetrator. The California Supreme Court has recognized that all principals in a crime, including aiders and abettors, are " 'equally guilty' " in the sense that they are all "criminally liable." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.) Our high court, however, has also recognized that, in some cases, an instruction characterizing all principals as "equally guilty" may be misleading because aiders and abettors are not always guilty of the same crime as the actual perpetrator.[16] (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 433.)

In the present matter, the trial court instructed the jury with CALCRIM No. 400. The jurors were told that a person may be guilty of a crime in two ways, either as a perpetrator or as an aider and abettor. The jurors were instructed that a person is guilty of a crime whether he committed it personally, or he aided and abetted the perpetrator. The "equally guilty" language came later when the court provided its own special instruction to the jury.[17] That disputed term was neither repeated nor emphasized.

During closing argument, the defense asserted it was B.M. who had shot Abarca. According to the defense, B.M. had fired at Abarca in an effort to defend appellant because Abarca had pulled out his knife. The defense asked the jurors to find appellant not guilty of murder.

---

**16** CALCRIM No. 400, which instructs on the general principles of aiding and abetting, does not contain the "equally guilty" language. In contrast, CALJIC No. 3.00, which is its counterpart, does contain this language.

**17** With its special instruction, the court informed the jurors that they did not need to unanimously agree or individually determine whether appellant was an aider and abettor or the direct perpetrator for his murder liability in count 1. This was a correct statement of law. Unanimity is not required regarding the theory that supports a murder conviction so long as the jury is convinced beyond a reasonable doubt that the defendant is guilty. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1024–1025.)

During its closing remarks to the jury, the prosecutor never asserted or even reasonably suggested that the jury could find appellant guilty of first degree premeditated murder just because B.M. was involved. To the contrary, the prosecutor repeatedly asserted that appellant was the direct perpetrator who had intended Abarca's death. The prosecutor argued that the surveillance footage established that it was appellant who had directed B.M.

Based on the totality of this record, appellant does not demonstrate a reasonable likelihood the jury misunderstood the court's legal instructions or misapplied the law. This record overwhelmingly establishes that the jury found appellant guilty of premeditated murder stemming from his own intent to kill. Accordingly, appellant's claim of instructional error is without merit.

## V. Cumulative Error did not Occur.

Appellant raises a claim of cumulative error. He contends that, even if we reject his arguments above, reversal of his judgment is still required because he suffered a fundamentally unfair trial. He argues that a series of errors devastated his right to a fair trial regarding his premeditated intent to kill. We disagree.

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid.*)

We reject appellant's claim of cumulative error because we have denied all of his individual claims. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].) Taking all of appellant's claims into account, we are satisfied that he received a fair adjudication regarding his guilt for first degree murder, along with the

30.

other charges.  As we explain below, however, the gang-related charge and enhancements must be reversed due to retroactive changes in the law.

**VI.    We Reverse all Gang Enhancements, the Gang Conviction in Count 4, and the Special Circumstance Finding that Triggered LWOP.  We Vacate Appellant's Sentence and Remand this Matter for Further Proceedings.**

On January 1, 2022, Assembly Bill No. 333 went into effect.  This bill added new elements in section 186.22 regarding both the substantive gang offense and gang enhancements.  (*People v. Tran* (2022) 13 Cal.5th 1169, 1207 (*Tran*).)

First, Assembly Bill No. 333 narrowed the definition of a "criminal street gang" to require that any gang be an "ongoing, *organized* association or group of three or more persons."  (§ 186.22, subd. (f), italics added.)

Second, section 186.22, former subdivision (f), only required that a gang's members "individually *or* collectively engage in" a pattern of criminal activity in order to constitute a "criminal street gang."  In contrast, Assembly Bill No. 333 requires that any such pattern have been "collectively" engaged in by members of the gang.  (§ 186.22, subd. (f).)

Third, Assembly Bill No. 333 narrowed the definition of a "pattern of criminal gang activity" by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang "members," as opposed to just "persons"; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)

Lastly, Assembly Bill No. 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any "common benefit" be "more than reputational."  (§ 186.22, subd. (g).)  Our Supreme Court has endorsed the requirement that, for a gang enhancement to be imposed, both the predicate and currently charged

31.

offenses must provide more than a reputational benefit to the gang. (*Tran*, *supra*, 13 Cal.5th at p. 1207.)

The parties agree, as do we, that appellant benefits from Assembly Bill No. 333. It is undisputed that this bill applies retroactively to any criminal matter that is not yet final on appeal. (*Tran*, *supra*, 13 Cal.5th at pp. 1206–1207, citing *In re Estrada* (1965) 63 Cal.2d 740.) In light of these retroactive amendments, respondent concedes that the jury's true findings regarding the gang enhancements in count 1 (Abarca's murder) and in count 7 (the subsequent jail assault on Thatcher) must be vacated, and this matter remanded to afford the People an opportunity to retry those enhancement allegations. Respondent notes that the evidence does not demonstrate beyond a reasonable doubt that either Abarca's murder or the subsequent jail assault provided a benefit to appellant's gang that was more than reputational. We agree.

When discussing both Abarca's murder and the subsequent jail assault on Thatcher, the prosecution's gang expert only provided possible reputational benefits as to why these crimes might have occurred. Nothing in this record demonstrates or even reasonably suggests that either of these two crimes was committed for "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).) As such, respondent's concession is appropriate and we will vacate the jury's true findings in counts 1 and 7 regarding the gang enhancements (§ 186.22, subd. (b)(1)). Accordingly, we also vacate appellant's sentence and remand this matter for further proceedings.[18] As appellant concedes, the People may retry these gang enhancements

---

[18] We agree with the parties that, when resentencing occurs, appellant benefits from the retroactive application of three bills: (1) Senate Bill No. 567 (2021-2022 Reg. Sess.); (2) Assembly Bill No. 518 (2021-2022 Reg. Sess.); and (3) Assembly Bill No. 124 (2021-2022 Reg. Sess.). Our disposition directs the trial court to consider these bills when appellant is resentenced.

under the new requirements of amended section 186.22. (See *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128; *People v. Lopez* (2021) 73 Cal.App.5th 327, 346.)

The parties dispute whether or not the four remaining gang-related findings by the jury must be vacated in light of Assembly Bill No. 333. At issue are the following:

(1) Appellant's conviction in count 4 as an active gang participant (§ 186.22, subd. (a));

(2) The gang enhancements (§ 186.22, subd. (b)(1)) in counts 2 and 3 (illegal possession of a firearm and ammunition, respectively); and

(3) The gang-murder special-circumstance enhancement that triggered LWOP (§ 190.2, subd. (a)(22)).

For the reasons explained below, we agree with appellant that the gang conviction and other gang-related enhancements must also be reversed.[19]

### A. In light of *Cooper*, the gang conviction and all of the gang enhancements must be reversed.

Our high court's recent opinion in *Cooper* is instructive. The defendant was convicted of first degree murder, and he received gang and firearm enhancements. (*Cooper*, *supra*, 14 Cal.5th at p. 738.) At trial, the prosecution introduced into evidence two predicate offenses; both involved a single gang member belonging to the defendant's gang. One predicate offense involved a robbery and the other involved the sale of narcotics. In response to a hypothetical, the prosecution's gang expert explained how the underlying murder had benefited the gang, but the expert did not testify as to how the alleged predicate offenses had benefited the gang. (*Cooper*, *supra*, at pp. 740–741.) The gang expert stated that a murder like the one in that case would benefit the gang by eliminating a rival and by maintaining respect, but money was " 'number one' " for the

---

[19] In his reply brief, appellant erroneously contends that a gang enhancement in count 6 should be reversed. However, the charge in count 6 did not go to the jury. It appears that this count was dismissed prior to the evidentiary phase of trial.

gang. (*Id.* at p. 741.) The jury was not instructed on the new elements required under Assembly Bill No. 333. Specifically, the jury was never told that the predicate offenses must have commonly benefited the criminal street gang in a way that was more than reputational. (*Cooper*, *supra*, at p. 743.) Our high court agreed with the defendant that the absence of the jury instruction on this new requirement was not harmless beyond a reasonable doubt under *Chapman*. (*Cooper*, at p. 746.) The *Cooper* court rejected the Attorney General's position that it was appropriate to ask in this situation whether the jury could draw "a reasonable inference" that the alleged predicate offenses had "commonly benefited the gang." (*Id.* at p. 743, fn. 7.) To the contrary, the high court clarified that when a jury instruction has omitted an element of an offense, the issue on appeal is whether the record contains evidence that could rationally lead to a contrary finding regarding the omitted element. (*Id.* at pp. 742–743, citing *People v. Mil* (2012) 53 Cal.4th 400, 417.)

The *Cooper* court concluded that the record before it did not disclose the circumstances surrounding the two predicate offenses introduced at the defendant's trial, and the prosecution never introduced any evidence regarding how the gang commonly benefited from them. The high court noted that, although robbery and the sale of narcotics could typically provide a financial benefit to the offender, evidence existed that could "rationally lead to a contrary finding regarding whether the fruits of the offenses were intended to or did benefit the *gang as a whole*." (*Cooper*, *supra*, 14 Cal.5th at p. 743.) The high court stated that the financially based predicate crimes could have been committed by the individual gang members for their own personal gain, and not every crime committed by a gang member is related to the gang. In this way, whether an offense is within a gang's primary activities is distinct from whether a particular offense has commonly benefited the gang. (*Ibid.*)

Finally, our Supreme Court explained that a jury determination about a gang's primary activities only constitutes a conclusion about the types of activities in which a

34.

gang typically engages. On the other hand, the question about a common benefit asks about how the specific predicate offenses actually benefited the gang. In the defendant's trial, the jury had been instructed in accordance with the former law that the predicate offenses need not be gang related. That instruction, however, directly contradicted Assembly Bill No. 333, which requires that the predicate offenses commonly benefit the criminal street gang, and the common benefit from the offenses is more than reputational. (*Cooper*, *supra*, 14 Cal.5th at pp. 743–744.) Based on its record, the *Cooper* court held that the jury could have reasonably concluded that the predicate offenses at issue were committed only for personal gain. (*Id.* at p. 744.)

We asked the parties to provide supplemental briefing regarding *Cooper*. Appellant asserts that we must follow *Cooper* and reverse all of the gang enhancements and the gang conviction. In contrast, respondent contends that *Cooper* is distinguishable. Respondent maintains that only the gang enhancements in counts 1 and 7 should be reversed.

We agree with appellant and reject respondent's position. *Cooper* establishes that the gang enhancements and the gang conviction must be reversed in light of Assembly Bill No. 333. At the trial in this matter, the prosecution introduced the following three predicate crimes[20] to establish a pattern of criminal gang activity:

(1) A member of appellant's gang, Joel Arrazate, was arrested in 2018 following a traffic stop. Arrazate was eventually convicted of carrying a loaded firearm in a vehicle on a public street in violation of section 25850, subdivision (c)(6). He was also convicted of a misdemeanor for actively participating in a criminal street gang in

---

[20] We note that these three predicate offenses occurred in 2018 and 2019, which complies with the timing requirements of section 186.22. (See § 186.22, subd. (e)(1).) We also observe that these predicate offenses all involved various firearm-related convictions that are statutorily acceptable to prove a pattern of criminal gang activity. (See § 186.22, subd. (e)(1)(X), (Y) & (Z).)

violation of section 186.22, subdivision (a). At trial in this matter, the prosecution's gang expert, who was personally familiar with Arrazate, opined that Arrazate was an active VWR member when this traffic stop had occurred. The expert confirmed at trial that possession of a firearm is a primary activity of the VWR.

(2) Two members of appellant's gang—Oscar Zuniga and Raul (Carrillo) Alvarez—were arrested in 2019 following a traffic stop in which they were together in the vehicle. A single firearm was found inside a backpack in the vehicle. Its serial number had been altered to prevent a records check. Zuniga and Alvarez were eventually convicted of carrying a concealed firearm in violation of section 25400, subdivision (c)(6). At trial in this matter, the prosecution's gang expert opined that both Zuniga and Alvarez were active members of the VWR when this traffic stop had occurred. The expert was personally familiar with Zuniga. The expert confirmed that Zuniga's and Alvarez's possession of the unregistered firearm was a primary activity of the VWR gang.

(3) Appellant was arrested in 2018 following a traffic stop. He fled on foot before being apprehended. During his flight, he discarded a backpack which law enforcement recovered. A loaded .22-caliber revolver was located inside the backpack, along with about 200 grams of marijuana. Appellant was eventually convicted of being a felon in possession of a firearm in violation of section 29800, subdivision (a)(1). He also was convicted of a misdemeanor for being an active gang member in violation of section 186.22, subdivision (a). In the present trial, the prosecution's gang expert confirmed to the jury that appellant's possession of the firearm was a primary activity of the VWR gang.

To demonstrate that *Cooper* is distinguishable, respondent focuses on testimony from the prosecution's gang expert introduced in appellant's trial. After discussing the predicate offenses, the prosecution's gang expert later generally and very briefly explained the importance of firearms for a gang. The expert stated that appellant's gang

36.

benefits when active gang members possess a firearm. According to the gang expert, those gang members could commit other crimes, and use the firearms for "offensive and defensive purposes."

We reject respondent's position that it is appropriate to affirm the gang conviction and the remaining gang enhancements. We acknowledge that the predicate offenses in *Cooper* were financial in nature, whereas the predicate offenses here involved the illegal possession of firearms. We also acknowledge that, in general, the prosecution's gang expert commented that firearms do benefit the gang. Nevertheless, enough of the deficiencies articulated in *Cooper* exist in this record to mandate reversal.

Appellant's jurors were instructed with CALCRIM No. 736. They were told that they need not agree which crimes established a pattern of criminal gang activity so long as they all agreed that two or more crimes satisfied the requirements. Two of the predicate offenses introduced in this matter involved a single gang member who was armed but not otherwise using the respective firearm to commit crimes. The third predicate offense involved two gang members who each illegally possessed the same firearm, but that firearm was not being used to commit crimes. It is apparent that these individual gang members personally benefitted from possessing a firearm. However, analogous to *Cooper*, we cannot simply extrapolate "a reasonable inference" that these alleged predicate offenses must have commonly benefited the entire gang. (See *Cooper*, *supra,* 14 Cal.5th at p. 743, fn. 7.) To the contrary, one or more jurors could have rationally concluded that some, if not all, of these gang members possessed their firearms for personal gain and not to benefit the gang as a whole. (See *Cooper*, *supra*, at pp. 742–743; see also *People v. Mil*, *supra*, 53 Cal.4th at p. 417.) Consequently, no evidence demonstrates that these predicate offenses "*actually* benefited the gang." (*Cooper*, *supra*, at pp. 743–744, citing *People v. E.H.* (2022) 75 Cal.App.5th 467, 473.)

Moreover, and similar to *Cooper*, appellant's jury was never instructed that the predicate offenses must have commonly benefited the gang in a way that was more than

reputational. (§ 186.22, subd. (e)(1).) Appellant's jury was instructed under the old law and told that the predicate offenses need not be gang related to establish a pattern of criminal gang activity. The jurors were even told that they could consider the current charged crimes in deciding whether or not a pattern of criminal gang activity had been established. Under Assembly Bill No. 333, these instructions are no longer permitted. (§ 186.22, subd. (e)(1) & (2).) The Legislature has not declared that mere firearm possession provides a common benefit to a gang that is more than reputational. (§ 186.22, subd. (g).)

We cannot declare that the failure to instruct the jury on the new requirements under Assembly Bill No. 333 was harmless beyond a reasonable doubt. This record contains evidence from which jurors could rationally conclude the predicate offenses do not meet the new requirements. Accordingly, *Cooper* mandates that we reverse all of the gang enhancements and the conviction in count 4 for appellant's active gang participation.[21] We will remand this matter to afford the prosecution an opportunity to

---

[21] Because reversal is required under *Cooper*, we do not resolve the parties' other disputes, including whether the predicate offenses show a collective pattern of criminal gang activity. Following the passage of Assembly Bill No. 333, the Courts of Appeal are split on what the term "collectively" means in establishing the predicate offenses necessary to prove a gang enhancement. Some courts hold that "collectively" requires proof that each predicate offense was committed by two or more gang members. (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1088–1089; *People v. Lopez, supra*, 73 Cal.App.5th at pp. 344–345.) In contrast, at least one published opinion holds that collective action may be shown by two gang members who separately committed crimes on different occasions. (*People v. Clark* (2022) 81 Cal.App.5th 133, 145–146, review granted Oct. 19, 2022, S275746.) This issue is currently before the California Supreme Court, which is going to decide whether the People can meet their burden of establishing a pattern of criminal gang activity under section 186.22 by presenting evidence of individual gang members committing separate predicate offenses, or whether the People must provide evidence of two or more gang members working in concert with each other during each predicate offense. (*People v. Clark* (2022) 81 Cal.App.5th 133 [299 Cal.Rptr.3d 569, 518 P.3d 278, 279], review granted Oct. 19, 2022, S275746.)

retry the gang charge and the gang enhancements.  We turn to the gang-murder special-circumstance finding that triggered LWOP.

> **B.** **The gang-murder special-circumstance finding will be reversed.**

The parties dispute whether Assembly Bill No. 333 constitutionally amended the elements necessary for the jury to find true the gang-murder special-circumstance allegation under section 190.2, subdivision (a)(22).  There is currently a split of authority on this issue.  Respondent asks us to follow the majority opinion from *People v. Rojas* (2022) 80 Cal.App.5th 542, review granted October 19, 2022, S275835 (*Rojas*), which was issued by a different panel of this district.  In contrast, appellant contends that this panel should "reconsider" *Rojas* and follow *People v. Lee* (2022) 81 Cal.App.5th 232, review granted Oct. 19, 2022, S275449 (*Lee*).  We summarize these and two other applicable opinions.

First, in *People v. Lopez*, *supra*, 73 Cal.App.5th 327, the Second Appellate District, Division Eight, concluded that Assembly Bill No. 333 impacted not only the gang enhancement allegations under section 186.22, but other statutes that expressly incorporate provisions of that statute, including section 190.2, subdivision (a)(22). (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346.)  Section 190.2, subdivision (a)(22), was enacted as part of Proposition 21, an initiative measure approved by the electorate in the March 2000 primary election.  (*People v. Shabazz* (2006) 38 Cal.4th 55, 64–65.) Section 190.2, subdivision (a)(22), makes first degree murder a capital crime if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, *as defined in subdivision (f) of Section 186.22*, and the murder was carried out to further the activities of the criminal street gang."  (Italics added.)  *People v. Lopez* held that Assembly Bill No. 333 must be construed as altering the elements necessary for a jury to find true a gang-murder special-circumstance allegation.  (*People v. Lopez*, *supra*, 73 Cal.App.5th at p. 347.)

In *Rojas*, a divided panel in our district reached the opposite conclusion. The *Rojas* majority held that Assembly Bill No. 333 is unconstitutional to the extent it would reduce the scope of conduct that Proposition 21 made punishable under section 190.2. (*Rojas*, *supra*, 80 Cal.App.5th at p. 557.) The *Rojas* majority concluded that Proposition 21 had required a two-thirds vote in each house for the Legislature to amend its provisions. However, Assembly Bill No. 333 had not complied with that requirement. (*Rojas*, *supra*, 80 Cal.App.5th at p. 555.) Thus, *Rojas* holds that Assembly Bill No. 333 cannot amend Proposition 21. (*Rojas*, at p. 555.)

In *Lee*, *supra*, Division Four of the Second District determined that Assembly Bill No. 333 does not unconstitutionally amend section 190.2, subdivision (a)(22). Focusing on the question of voter intent, the *Lee* court opined there is "nothing to suggest that the electorate intended to impose a time-specific incorporation of the term 'criminal street gang' in the gang-murder special-circumstance statute." (*Lee*, *supra*, 81 Cal.App.5th at p. 245.) Accordingly, *Lee* holds "that the term 'criminal street gang' as incorporated in the gang-murder special-circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (*Ibid.*, citing *In re Jovan B.* (1993) 6 Cal.4th 801, 816 & fn. 10.)

Finally, in *People v. Lopez* (2022) 82 Cal.App.5th 1, another panel from this district held that Assembly Bill No. 333 did not unconstitutionally amend the crime of gang conspiracy proscribed by section 182.5, which was enacted as part of Proposition 21. (*People v. Lopez*, *supra*, 82 Cal.App.5th at p. 21.) That panel observed that, in practical effect, "*Rojas* holds that a special circumstance murder allegation under section 190.2(a)(22) may be proven based on a different, less restrictive definition of a 'criminal street gang' than is found in the current version of section 186.22. [Citation.]" (*People v. Lopez*, *supra*, 82 Cal.App.5th at p. 15.)

The California Supreme Court is currently considering how to resolve this split of authority. (See *People v. Rojas* (2022) 80 Cal.App.5th 542 [299 Cal.Rptr.3d 568, 518

P.3d 278], review granted Oct. 19, 2022, S275835.) We decline to follow *Rojas* and we agree with *Lee*. (See *People v. Lopez*, *supra*, 82 Cal.App.5th at p. 21.) Accordingly, we conclude that the changes imposed by Assembly Bill No. 333 apply to section 190.2, subdivision (a)(22). Thus, the jury's true finding regarding the gang-murder special-circumstance finding must be vacated in light of the new elements necessary to establish "a criminal street gang." We will remand this matter for further proceedings.[22] The prosecution shall have the opportunity to retry this special circumstance allegation under the requirements of Assembly Bill No. 333. (See *Lee*, *supra*, 81 Cal.App.5th at p. 245.)

## VII. The Judgment will not be Reversed due to the Failure to Bifurcate the Gang Evidence.

Assembly Bill No. 333 added section 1109, which permits a defendant to request bifurcation of alleged gang enhancements, and it requires bifurcation of any charge that a defendant is actively participating in a criminal street gang. (§ 1109, subds. (a) & (b), added by Stats. 2021, ch. 699, § 5.) Bifurcation did not occur in appellant's trial. As such, appellant filed a supplemental brief in this court asserting that his entire judgment must be reversed per se. In the alternative, he contends that his entire judgment must be reversed due to prejudice. We reject those arguments.

Another panel from this district has held that section 1109 does not apply to gang-murder special-circumstance allegations under section 190.2, subdivision (a)(22). (*People v. Montano* (2022) 80 Cal.App.5th 82, 114.) Our high court denied review of that opinion, and we reject appellant's position that it was wrongly decided. The express

---

[22] Because we reverse the jury's true finding regarding the special-circumstance gang-murder allegation, we do not address appellant's alternative argument that this finding must be reversed due to alleged instructional error. In addition, we do not address appellant's claim that his rights to equal protection were violated under the state and federal Constitutions because he is statutorily ineligible to obtain a youth offender parole hearing under section 3051 while other persons sentenced to LWOP qualify for such a hearing. Because it is not "absolutely required," we will not address this constitutional question. (*People v. Hopson* (2017) 3 Cal.5th 424, 466.)

41.

terms of section 1109 do not state that bifurcation is required for an allegation under section 190.2.  (See § 1109, subds. (a) & (b).)  It is for the Legislature, and not an appellate court, to rewrite section 1109.  (*People v. Montano*, *supra*, 80 Cal.App.5th at p. 114.)  Consequently appellant is incorrect that bifurcation was required in light of the special-circumstance allegation that was at issue in this trial.  In any event, any assumed error was harmless.

Our Supreme Court holds that the failure to bifurcate gang evidence does not constitute "structural error" requiring automatic reversal.  (*Tran*, *supra*, 13 Cal.5th at p. 1208.)  It is also not appropriate to rely on the federal standard under *Chapman* to analyze prejudice in this situation.  (*Tran*, *supra*, at p. 1209.)  Instead, the erroneous admission of evidence under state law results in a due process violation only if the trial was fundamentally unfair.  (*Ibid.*)  Here, the gang evidence provided a possible motive for why appellant might have committed the charged crimes.  The surveillance footage amply demonstrated that appellant held a premeditated intent to kill Abarca.  It was undisputed that appellant committed the subsequent jail assault.  Accordingly, a due process violation did not occur when the gang evidence was introduced at trial because appellant's trial was not rendered fundamentally unfair.  (See *Tran*, *supra*, 13 Cal.5th at p. 1209.)

Applying the *Watson* standard for state law error, any presumed error is harmless.  The evidence of appellant's premeditated murder conviction was overwhelming, as was the evidence of his subsequent jail assault.  Appellant does not explain "how the exclusion of gang evidence in this case would have been reasonably likely to change the jury's verdict of guilt as to the underlying murder."  (*Tran*, *supra*, 13 Cal.5th at p. 1209.)  Given the overwhelming evidence of his guilt, it is not reasonably likely a bifurcated trial

would have changed the jury's verdict. (*Id.* at p. 1210.) Consequently, this claim is without merit.[23]

**VIII. The abstracts of judgment have clerical errors.**

The parties agree, as do we, that the indeterminate abstract of judgment contains a clerical error. In count 1, the trial court sentenced appellant to LWOP, plus an additional consecutive 25 years to life for the personal use of a firearm (§ 12022.53, subd. (d)). The indeterminate abstract of judgment, however, erroneously lists both LWOP and a sentence of 25 years to life for Abarca's murder, plus a firearm enhancement of 25 years.

We have vacated appellant's sentence and remanded this matter for further proceedings, including resentencing. Following remand, and if appellant again receives the same sentence in count 1—i.e., LWOP, plus a firearm enhancement of 25 years to life—we direct the trial court to ensure that this same clerical mistake is not repeated. To assist the clerk, we note that the firearm enhancement of 25 years to life should only be memorialized in box 2. The firearm enhancement should not be memorialized in box 6.b.

In addition to that clerical error, the determinate abstract of judgment fails to list the sentence imposed in count 3, which was stayed.[24] Following resentencing we direct the court to ensure that all convictions and sentences, even if stayed, are reflected in the abstract of judgment. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [an abstract of judgment may not add to or modify the judgment it summarizes].)

---

**23** The question of whether section 1109 applies retroactively is the subject of a split of authority among the Courts of Appeal. (See, e.g., *People v. Burgos* (2022) 77 Cal.App.5th 550, 566–567, review granted July 13, 2022, S274743; *People v. Ramos*, *supra*, 77 Cal.App.5th 1116, 1131; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17, 2022, S275341.) We need not resolve that issue. Instead, any asserted error in failing to bifurcate was harmless. (See *Tran*, *supra*, 13 Cal.5th at p. 1208 [declining to resolve question of retroactivity due to harmless error].)

**24** In count 3, appellant was convicted of possession of ammunition by a felon (§ 30305, subd. (a)), and the jury found true a gang enhancement. The court imposed an aggravated prison term of three years, plus four years for the gang enhancement.

43.

## DISPOSITION

The jury's true findings regarding all gang enhancements (§ 186.22, subd. (b)(1)), the gang conviction in count 4 (§ 186.22, subd. (a)), and the gang-murder special-circumstance allegation in count 1 (§ 190.2, subd. (a)(22)) are vacated. Appellant's sentence is vacated and this matter is remanded for further proceedings. The prosecution shall have the opportunity to retry the gang-related charge and enhancements. Absent a waiver of time, if the People do not bring appellant to retrial within the time limits of section 1382, subdivision (a)(2), the trial court shall proceed to resentence appellant in conformity with this opinion. When resentencing occurs, appellant shall benefit from the retroactive application of (1) Senate Bill No. 567 (2021-2022 Reg. Sess.); (2) Assembly Bill No. 518 (2021-2022 Reg. Sess.); and (3) Assembly Bill No. 124 (2021-2022 Reg. Sess.). Following resentencing, the trial court shall cause new abstracts of judgment to be forwarded to the appropriate authorities. We direct the trial court to ensure that the new abstracts of judgment are free of the clerical mistakes that are addressed in this opinion. In all other respects, appellant's judgment is affirmed.

LEVY, J.

WE CONCUR:


HILL, P. J.


FRANSON, J.

44.